NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0304n.06

Case No. 14-5831

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Apr 27, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| MAURICE DARNELL TYLER, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE MIDDLE DISTRICT OF |
| GAYLE RAY, Commissioner of Corrections | ) | TENNESSEE |
| and HENRY STEWARD, Warden, | ) | |
| | ) | |
| Respondents-Appellants. | ) | |
| | ) | |

BEFORE: SILER, BATCHELDER, and ROGERS, Circuit Judges.

**SILER**, Circuit Judge. Representatives of the State of Tennessee ("the warden") appeal a district court's decision to grant habeas relief to a prisoner on the basis of ineffective assistance of trial counsel. A jury convicted Maurice Tyler of the premeditated murder of two people at a Nashville nightclub in 2002, even though his accomplice, who had previously pleaded guilty to being the getaway driver, testified at trial that he was the shooter and that Tyler was not involved. In his habeas petition, Tyler argued that his trial counsel was ineffective for failing to call one of the getaway driver's attorneys as a witness to bolster the getaway driver's confession. The district court agreed and granted the writ. On appeal, the warden argues that the district court erred in finding that (1) Tyler's claim was not barred by the statute of limitations and (2) the Tennessee Court of Criminal Appeals acted unreasonably when it denied Tyler's post-

conviction petition. Because the Tennessee courts' resolution of Tyler's Sixth Amendment claim was not unreasonable, we **VACATE** the writ of habeas corpus and **REMAND** the case to the district court.

## I.

Tyler and Christopher Schultz were close friends. They were both living in Tyler's mother's house when they were victims of a home invasion. Tyler is African-American and Schultz is Caucasian.

One of the people who robbed Tyler's house was Monty Campbell. Tyler testified against Campbell at Campbell's preliminary hearing. An officer would later testify he overheard Tyler muttering to himself after the hearing that he would kill Campbell when Campbell got out of jail. In August 2002, several years later, Campbell was released on parole.

Before dawn on November 25, 2002, Tyler and Schultz were at the Outer Limits night club in Nashville, Tennessee. Campbell was there, too. As Campbell and his girlfriend Cayra Carruth got into a car to leave the club, they were shot. A club employee, Jared Johnson, watched it happen. The gunman reloaded twice, firing a total of twenty-eight bullets into the car, killing both occupants.

After the gunman left in a dark-colored Saturn, Johnson gave chase for several miles in his own car. During the pursuit, Johnson spoke to a 911 operator and filmed the fleeing Saturn with a video camera. Police obtained the video and interviewed other witnesses at the scene. Although the witnesses' descriptions of the gunman were not entirely consistent—including their opinions on whether the gunman was white, black, or Hispanic—Schultz and Tyler soon became suspects. A key piece of evidence was that the Saturn was registered to Tyler's mother and belonged to Schultz.

Schultz initially told police he was not the shooter. But he soon changed his story and began telling investigators and his attorneys that he was the trigger man. He insisted that his friend Earl Shannon, who was deceased by that time, was the getaway driver, and that Tyler was not involved at all.

Schultz pleaded guilty about two weeks before Tyler's trial. At the plea colloquy, Schultz, under oath, agreed with the government's theory that he was the getaway driver and Tyler was the shooter.

Tyler's trial strategy was to convince the jury that Schultz's version of events was true. Schultz testified at Tyler's trial that he shot Campbell and Carruth, and that Tyler was not involved. On cross examination, Schultz admitted that he first told police he was the driver, and that, in pleading guilty, he admitted under oath to the government's theory of events. Nevertheless, he insisted that he lied in his first statements to police and that he felt he had to agree to the government's version of events at his plea hearing.

To bolster Schultz's credibility, Tyler's counsel played to the jury a videotape of Schultz's earlier confession to police that he was the killer. Tyler's counsel would later testify that he believed Schultz's testimony and videotaped confession were "pretty moving" and "pretty convincing," and that he was surprised when the jury convicted Tyler of two counts of premeditated murder and one count of felony murder. Tyler was sentenced to life without the possibility of parole. The Tennessee Court of Criminal Appeals upheld his convictions. *State v. Tyler*, No. M2005-00500-CCA-R3-CD, 2006 WL 264631 (Tenn. Crim. App. Feb. 1, 2006), *appeal denied* (Tenn. June 26, 2006).

Tyler then petitioned for state post-conviction relief. Among his grounds for relief, he faulted his trial counsel for failing to call Schultz's attorneys and other witnesses who had heard

Schultz confess that he was the shooter. Jonathan Wing represented Schultz during his guilty plea. At the post-conviction hearing, Wing

> testified that Schultz never wavered from his insistence that he was the shooter and that [Tyler] was not involved in the murders. However, Wing stated that he was more inclined to believe the State's theory of the case than the version of events expounded by Schultz, noting that the proof was not consistent with Schultz's claims.

*Tyler v. State*, No. M2008-02199-CCA-R3-PC, 2010 WL 2025459, at *2 (Tenn. Crim. App. May 21, 2010), *appeal denied* (Tenn. Aug. 26, 2010). The post-conviction court denied Tyler's petition, and the Tennessee Court of Criminal Appeals affirmed. *Id*. at *8. Regarding the question of whether Tyler's trial counsel was ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984), for failing to call corroborating witnesses, including Wing, to testify, the appellate court explained:

> The post-conviction court noted that Schultz's credibility was a major issue at trial and that his credibility was "severely damaged by the self-serving facts adopted into his plea testimony and by his statements to police—all suggesting that he was not the shooter." The court found that introducing evidence of prior consistent statements would not have negated the presence of the inconsistent statements. Therefore, the court found that [Tyler] was not prejudiced by counsel's failure to call witnesses to testify regarding Schultz's prior consistent statements. The record does not preponderate against this finding.

*Tyler*, 2010 WL 2025459, at *7.

Tyler then petitioned for a federal writ of habeas corpus under 28 U.S.C. § 2254. Tyler's amended petition asserted nine grounds for relief, including the theory that trial counsel was ineffective for failing to call witnesses to bolster Schultz's confessions. The district court noted that (1) the federal habeas limitations period expired on December 3, 2010; (2) Tyler placed his petition in the prison mail room on December 9, 2010; and (3) Tyler amended his petition on April 25, 2013. The district court determined that all but two claims were time-

barred. Regarding the claim related to Wing, the district court concluded that Tyler "made a sufficient showing of actual innocence to overcome his six-day delay." *Tyler v. Steward*, No. 3:10-1187, 2014 WL 3644072, at *3 (M.D. Tenn. July 21, 2014).

Ultimately, the district court granted the writ solely on the claim that trial counsel failed to call Wing as a witness. *Id*. at *23. The court reasoned:

> Upon consideration of the State courts' findings of fact on this claim, the Court is unable to conclude that the Tennessee courts' decision on this claim was reasonable. Here, the State courts found that "Schultz's credibility was a major issue at trial." [*Tyler*, 2010 WL 2025459, at *7]. [Tyler's] counsel interviewed Wing and also had proof of his testimony. Wing's testimony would clearly have negated the effect of Schultz's prior inconsistent statements by demonstrating Schultz's consistent statements to his counsel that he was the shooter. According to Wing, Schultz "never wavered" in his statements that he was the shooter. *Id.* at *2. Where the critical issue is whether [Tyler] or Schultz shot the victim and Schultz's credibility is the major issue at trial, then any proof that was consistent with [Tyler's] innocence would be [Tyler's] counsel's obligation to present and let the jury assess the credibility of the witnesses. Without Wing's testimony, the jury did not have the benefit of proof that Schultz was truthful in his testimony, as reflected by his consistent statements to his counsel. Without this proof, the Court cannot be assured as to what the jury's verdict may have been.

*Id*. at *22.

The warden moved to alter or amend the district court's judgment. While the warden argued that Tyler's attorney's decision not to call Wing was "strategic," the district court noted that Tyler's counsel testified that, in hindsight, he wished he had called Wing as a witness. The district court denied the motion and reaffirmed its position that failing to call Wing was not only *not* "strategic," it was objectively unreasonable under *Strickland*.

As we will explain, the Tennessee courts' decision was not an unreasonable application of *Strickland*, as required by 28 U.S.C. § 2254(d). Accordingly, we need not determine whether Tyler's petition was barred by the statute of limitations.

## II.

The Sixth Amendment to the United States Constitution grants criminal defendants the right to effective assistance of counsel to ensure a fair trial. *Strickland*, 466 U.S. at 686, 689. Claims of ineffective assistance of counsel present "mixed questions of law and fact" subject to de novo review. *Id.* at 698. To prevail on such a claim, a petitioner must prove both that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Id.* at 687.

Federal habeas corpus relief for state prisoners is governed by 28 U.S.C. § 2254, section (d) of which states:

> **(d)** An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>> **(1)** resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>> **(2)** resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For habeas petitions alleging ineffective assistance of counsel, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). Section 2254(d) requires that the state courts be granted more "deference and latitude" than would be available under a pure *Strickland* review. *Id.*

Congress designed this standard to be "difficult to meet." *Id.* at 102. The state court's decision must be more than simply wrong: "[E]ven a strong case for relief [under *Strickland*] does not mean the state court's contrary conclusion was unreasonable." *Id.* Although section 2254(d) does not completely bar federal review of previously-litigated state prisoner *Strickland* claims, it only allows for the writ to issue "in cases where there is no possibility fairminded

jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Id.*

In this case, the district court failed to apply the appropriate degree of deference to the state courts' decision. The question under *Strickland* is not what the reviewing judge would have done in hindsight, or even what the attorney himself would have done in hindsight. The question is whether the attorney's behavior at trial was so objectively unreasonable that it overcomes the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Under these standards, the analysis of the Tennessee Court of Criminal Appeals was not unreasonable.

Here, the defense's best strategy was to argue that Schultz's version of events (in which Tyler was not involved in the shooting) was true. The most compelling evidence for this version of events was Schultz's own live first-person account of how he killed the victims. Although Schultz clearly had credibility problems, Tyler's counsel attempted to rehabilitate Schultz's credibility by playing for the jury a video of Schultz's prior consistent confession to the police. Schultz's video confession was so compelling that a relative of one of the victims shouted, "You've killed my daughter," and had to be removed from the courtroom. *See Tyler*, 2014 WL 3644072, at *14.

In reviewing the state trial court's denial of Tyler's post-conviction petition, the Tennessee Court of Criminal Appeals accurately stated the *Strickland* standard as the governing law. *Tyler*, 2010 WL 2025459, at *6. That court then reasonably determined that introducing more "evidence of prior consistent statements" through Wing would not have significantly improved Schultz's credibility. *Id.* at *7.

The district court found this analysis unreasonable. We disagree. Adding Wing's testimony on top of Schultz's trial testimony and videotaped confession would not have so effectively bolstered Schultz's credibility as to overcome the state's other evidence.

When Tyler's trial attorney testified at the post-conviction hearing, he initially opined there was nothing more he could have done to establish that Schultz, not Tyler, was the shooter. Counsel explained that the videotape of Schultz's confession was "pretty moving" and "pretty convincing," especially when

> in the middle of that tape one of the family members of one of the victims got up and made a comment . . ., you've killed my daughter, or something to that effect. And I think he was removed from the courtroom. My point being, not only did I have Schultz there who I thought was pretty convincing that he was the shooter and then the videotape comes in, kind of reaffirming that. I just thought that we had convinced [the jury] that [Schultz] was the shooter at that point.

Tyler's counsel also said he

> had a lot of [pre-trial] conversations with [Schultz's attorneys] because they kept telling me that [Schultz] wants to get up on the stand and testify for you that he's the shooter. And they could not figure out why he wanted to do that, but I knew that he would do that.

Tyler's counsel also responded to a question about whether he considered calling Wing as a witness to bolster Schultz's testimony:

> I know there was an issue about whether or not to call Jon Wing. I'll tell you—I really thought once [Schultz] testified and that videotape was played, and we got the reaction out of the person in the audience, I thought, if that person in the audience believes that Schultz killed these people, I felt that we had shown that.

Counsel did admit at the post-conviction hearing that "[k]nowing what I know now," he would have called Schultz's attorneys to rehabilitate Schultz's testimony. But the rest of counsel's testimony suggests he made a conscious decision at trial not to call Wing.

Nor would Wing's testimony necessarily have been the sockdolager that rehabilitated Schultz's credibility. At Tyler's post-conviction hearing, Wing explained, "My position even at [the] time [of Schultz's plea deal and Tyler's trial] was that I was more inclined to believe the state's theory than Mr. Schultz's theory." Wing said he "didn't quite understand why" Schultz was claiming to be the shooter. Wing testified he believed that the state's theory "was more sort of inclined to be with the facts" than Schultz's story. "[I]n all of the proof we looked at," Wing said, "the dynamic was, essentially, me trying to say, I don't understand why you want to be the shooter here."

Although we are not certain that Wing's opinions on the evidence would have been admissible at Tyler's trial, this testimony does suggest that Wing might not have been the most effective witness to bolster Schultz's credibility. This observation weighs against any finding that Tyler's counsel was objectively unreasonable for failing to call Wing as a witness.

Accordingly, the state post-conviction court and Court of Criminal Appeals were not unreasonable in finding that Tyler's trial counsel had not rendered ineffective assistance. By no means was the Tennessee courts' decision "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

For this reason we **VACATE** the writ of habeas corpus and **REMAND** this case to the district court.

**ALICE M. BATCHELDER, Circuit Judge, concurring in the result.** I agree completely with the majority's analysis of the ineffective-assistance-of-counsel claim and would similarly find that the district court erred by granting a writ of habeas corpus—if reaching the merits were appropriate. It is not appropriate, however, because Tyler's petition is time-barred.

The Antiterrorism and Effective Death Penalty Act ("AEDPA") provides a one-year statute of limitations for federal applications for a writ of habeas corpus by a person in custody pursuant to a judgment of a state court. 28 U.S.C. § 2244(d)(1). Although the statute of limitations is "not jurisdictional," when it has been timely asserted by the warden it "effectively bars relief absent a showing that the petition's untimeliness should be excused based on equitable tolling and actual innocence." *Akrawi v. Booker*, 572 F.3d 252, 260 (6th Cir. 2009). The district court at least followed the correct procedure; it excused the statute of limitations based on a showing of actual innocence, even if that determination was incorrect. The majority, however, notes simply that the court "need not determine" whether the petition is time-barred because of its holding that Tyler loses on the merits. But AEDPA does not allow us to ignore a time bar to rule on the merits, regardless of whether the case has any merit.

This court is thus barred from deciding this case on the merits if Tyler's petition was untimely. And it was.[1] Tyler's limitations period began to run on "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). If a petitioner does not seek certiorari before the Supreme Court, the judgment becomes final for AEDPA purposes—and the limitations

---

[1]Tyler contends that the warden waived this issue because she failed to include it in her "Statement of the Issue." The warden did, however, include the time-bar issue in her table of contents and in the argument section of her brief. Further, Tyler responded to the time-bar issue in his brief, and the issue was fully argued at oral argument. Under similar circumstances, we have held that the issue is not waived. *See Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 540 (6th Cir. 2014); *Union Oil Co. of Cal. v. Prof'l Realty Invs., Inc.*, 72 F.3d 130, 1995 WL 717021, at *11 n.4 (6th Cir. 1995) (table decision).

period begins—after the ninety-day period in which he could have petitioned for certiorari. *Bronaugh v. Ohio*, 235 F.3d 280, 283 (6th Cir. 2000). Here, the Tennessee Supreme Court denied review of the case on June 26, 2006, concluding Tyler's direct review. The ninety-day certiorari period expired on September 26, 2006. Thus, the limitations period began to run on September 27, 2006.

AEDPA further provides that "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation." 28 U.S.C. § 2244(d)(2). On June 18, 2007, Tyler filed a state post-conviction petition. By this date, 266 days had run from the one-year statute of limitations. Upon filing the state post-conviction petition, however, the statute began to toll. It did not begin to run again until state post-conviction review was no longer "pending."

The warden and Tyler each point to a different date for when state post-conviction review was no longer pending. The warden argues that the relevant date is August 26, 2010, which is when the Tennessee Supreme Court issued its order denying Tyler's application for permission to appeal. Under this timeline, the statute of limitations expired on December 3, 2010, and Tyler's petition—which was filed on December 9, 2010—would have been untimely. Tyler, on the other hand, contends that the relevant date is September 14, 2010, which is when the Tennessee Supreme Court issued its mandate for the case. Under this timeline, the statute of limitations expired on December 22, 2010, and Tyler's petition would have been timely.

The timeliness of Tyler's petition thus hinges on when state post-conviction relief was no longer pending: either when the Tennessee Supreme Court issued its order or when it issued its mandate. Pointing to *Holland v. Florida*, 560 U.S. 631 (2010), and *Lawrence v. Florida*, 549

U.S. 327 (2007), Tyler argues that the Supreme Court has suggested that, as a blanket rule, the mandate is the relevant date. The Court has created no such blanket rule, however. Rather, the Court has noted that "until the application has achieved final resolution through the State's post-conviction procedures, by definition it remains 'pending.'" *Carey v. Saffold*, 536 U.S. 214, 220 (2002). Latching on to this language, the *Lawrence* Court, while noting that the relevant date in that case was the mandate, stated that an application for state post-conviction relief is finally resolved "[a]fter the State's highest court has issued its mandate *or* denied review." *Lawrence*, 549 U.S. at 332 (emphasis added). The Court thus has specifically contemplated either a denial of review or a mandate as "finally resolving" a state post-conviction petition.

So how do we determine when a state has "finally resolved" a post-conviction petition? The Court counsels us to look to the relevant state's practices. *See Day v. McDonough*, 547 U.S. 198, 203–05 (2006) (noting AEDPA's tolling provision is calculated from the issuance of the mandate by the Florida appellate court because "under Florida law, appellate order 'is pending' until the mandate issues"). Fortunately for us, Tennessee law is clear: the date of the decision, and not the date of the mandate, is the relevant date. *See Pinchon v. State*, No. M2003-00816-CCA-R3-PC, 2004 WL 193055, at *4 (Tenn. Crim. App. Jan. 28, 2004) ("This court has consistently held that the final action of the supreme court is the date of the filing of either the court's opinion or denial of application for permission to appeal.").

This means that, when the Tennessee Supreme Court issued its order denying Tyler's application for permission to appeal on August 26, 2010, Tyler's state post-conviction petition was no longer "pending," and the AEDPA statute of limitations began to run again. The statute thus expired on December 3, 2010. Because Tyler did not file his petition until December 9, 2010, his petition was untimely.

The district court recognized that the petition was untimely, but held that Tyler had made a sufficient showing of actual innocence to excuse the time bar. We have indeed allowed equitable tolling of AEDPA's statute of limitations based upon a credible claim of actual innocence. *See Souter v. Jones*, 395 F.3d 577, 588–90 (6th Cir. 2005). We have also warned, however, that equitable tolling "should only be granted sparingly." *Id.* at 588. The Supreme Court agrees; the actual innocence exception should "remain rare," being applied only in the "extraordinary case." *Schlup v. Delo*, 513 U.S. 298, 321 (1995) (internal quotation marks omitted). A credible showing of actual innocence requires "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *House v. Bell*, 547 U.S. 518, 537 (2006) (internal quotation marks omitted). This new evidence must lead us to a conclusion that "it is more likely than not that no reasonable juror would have found [Tyler] guilty beyond a reasonable doubt." *McCray v. Vasbinder*, 499 F.3d 568, 571 (6th Cir. 2007) (quoting *Schlup*, 513 U.S. at 327) (internal quotation marks omitted).

We do not have such an extraordinary case here. The district court did not elaborate on what evidence it believed comprised the "sufficient showing of actual innocence." Tyler has certainly shown no scientific or physical evidence, so his evidence must be "trustworthy eyewitness accounts" in order to apply. Wing's testimony does not qualify, as he was not an eyewitness to the crime. Schultz's testimony—through the supposed bolstering of Wing's testimony—does not qualify either, because although he was an eyewitness to the crime, he is far from trustworthy given the fact that he gave throughout the course of the investigation and trial four different accounts of the night in question. Without any new reliable evidence, Tyler is not

eligible for the actual innocence exception, and the time bar still applies. Because it applies, relief is inappropriate on that ground and that ground alone.

We have on occasion ruled on the merits in the alternative, while also recognizing that the time bar precludes relief in and of itself. *See Akrawi*, 572 F.3d at 261 ("Yet, for the reasons that follow, we conclude . . . that even if the merits of the petition were considered, the result would be the same: Akrawi is not entitled to habeas relief."). But that is not what the lead opinion has done here. For this reason, while I believe the majority is exactly correct in its analysis of the ineffective-assistance-of-counsel claim, I cannot join its opinion, because the merits should not have been reached. I concur only in the result of reversing the district court's grant of the writ.